UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER A. HOCHSTEIN, et al.,

    Plaintiffs,

vs.

MICROSOFT CORPORATION,

    Defendant.
_____/

Civil Action No.
04-CV-73071

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

## ORDER REQUESTING SUPPLEMENTAL BRIEFING

This is a patent infringement case. On December 14, 2009, Special Master Richard D. Grauer issued a "Report and Recommendation on Plaintiffs' Motion for Reconsideration of Claim Construction" ("R&R"). *See* docket entry 518. In his R&R, Special Master Grauer recommends that the Court grant Plaintiffs' Motion for Reconsideration[1] and construe the term "electrically connected," as used in claim 39 of the '125 patent, to include the phenomenon of "electromagnetic induction."

Pursuant to the Court's order dated December 15, 2009, *see* docket entry 519, Microsoft filed objections to the R&R, *see* docket entry 520, and Plaintiffs have responded. *See* docket entry 522. The Court heard oral argument on Microsoft's objections on March 5, 2010.

After oral argument on March 5, 2010, Special Master Grauer submitted, for the Court's consideration, an informal memorandum, which is attached as an addendum to this order. The Court

---

[1] On October 23, 2009, the Court held a hearing on Plaintiffs' Motion for Reconsideration.

1

construes the informal memorandum as a supplement to the Special Master's R&R dated December 14, 2009.

Fed. R. Civ. P. 53(f)(1) reads:

> **Opportunity for a Hearing; Action in General.** In acting on a master's order, report, or recommendations, the court must give the parties notice and an opportunity to be heard . . .

Because the supplemental memorandum constitutes an additional "report" and/or "recommendation" of the Special Master, Microsoft may file a supplemental brief, not to exceed ten pages in length, addressing the supplemental memorandum. Any supplemental brief must be filed by May 27, 2010. If Plaintiffs wish to be heard with respect to the supplemental memorandum, they may file a response brief, within fourteen days of the filing of Microsoft's brief, not to exceed ten pages in length. Microsoft may not submit a reply.

SO ORDERED.

Dated: 4-23-10  
Detroit, Michigan

PAUL D. BORMAN  
UNITED STATES DISTRICT JUDGE

To: Ben Anchill
From: Rick Grauer
Date: April 4, 2010
Re: Hochstein et al v. Microsoft Corporation et al
    Claim Construction – "Electrically Connected"

    This memo follows our conference in chambers yesterday in which you raised pertinent questions and we discussed several principles of patent claim construction. I offered to provide case law citations relevant to our discussions. They are included in the following outline of my analysis of this issue. I'm sorry it turned out longer than what I originally had in mind, but I hope it will be helpful as a synopsis of and supplement to my Report and Recommendation.

1. Claims "are generally given their ordinary and customary meaning. We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. . . . Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005 (*en banc*) (internal citations omitted).

2. The analysis begins with the intrinsic evidence (patent claims, specification and prosecution history). If the intrinsic evidence is ambiguous or inconclusive (as I believe it is here), it is proper to rely on extrinsic evidence, such as expert testimony, dictionaries and treatises. *Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576, 1582-84; *Markman v. Westview Instruments*, 52 F.3d 967, 979-81 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996).

3. Before the present dispute focused on electromagnetic induction, which occurs across the internal gap in isolation transformers, Microsoft's technical expert (Macedonia) stated that:
    > "A person of ordinary skill in the art would understand an electrical connection to be a connection that <u>allows an electrical current to flow between the connected components</u>." Report, May 1, 2009 (Dkt. 507-2, Exh. B, ¶38) (emphasis added).

    Later, Microsoft used similar language:
    > "Electrically connected is not a complicated term, and **the '125 patent does not give it any special or technical meaning**. If the term is to be construed, the Court should give 'electrically connected' its ordinary meaning, namely that whatever is being connected is connected in a way <u>that allows for the flow of electricity between the two things being connected</u>." Brief, June 22, 2009 (Dkt. 469, p.8) (emphasis added).

    In my opinion, these statements are admissions by Microsoft that the criterion is whether electricity flows between two connected elements, notwithstanding that there

may be an interposed gap in the conductors, such as the internal gap in an isolation transformer or capacitor, wherein electrical signals (but not literally current) cross the gap by the phenomenon of electromagnetic induction or capacitance, respectively.

4. In the Hearing on June 23, 2009, Hochstein requested that "electrically connected" be added to the list of terms to be construed. Tr. at 14, lines 17-24 (Dkt.477-3).

5. In Microsoft's June 25, 2009, Memo on claim construction, Microsoft again states that **"The '125 patent does not give it any special or technical meaning"** (emphasis added). They proposed a new construction of that term: "Thus, the Court should construe the term 'electrically connected' to mean: a connection that is in the form of electrically conductive connectors." (Dkt. 477, p.1)

6. As you pointed out yesterday, the *Bell Atlantic* case states that "[w]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term by 'implication.'" 262 F.3d 1258, 1271. But Microsoft twice, in the bold quotes in Paragraphs 3 and 5 above, admitted that no special or restrictive meaning appears in the patent. The patent's uses of "electrically connected" are discussed in my R&R (Dkt. 518 at 8-14). Leaving the use in the Title aside for the moment, it is significant that none of the other uses of that phrase is in the form of a definition of the term, or a disclaimer or exclusion of connections that include something other than a conducting wire.
    - *Bell Atlantic* includes a paragraph that is all over the map as to what must be found in a patent to establish a meaning that differs from the "ordinary meaning." See the paragraph beginning with "We have previously held . . . " at 262 F.3d at 1268. Note the standards such as "clearly set forth" or "clearly redefine" or "express intent to impart a novel meaning." These strict standards are echoed in more recent cases from the Federal Circuit, as follows:
    - "[O]ur cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise posses. In such cases, the inventor's lexicography governs. . . . In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Phillips, supra,* 415 F.3d at 1316 (emphasis added)(internal citations omitted).
    - "[T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. . . . Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim v. Medrad*, 358 F.3d 898, 906 (Fed. Cir. 2004) (emphasis added) (internal citations omitted).
    - "Although the construction of a claimed term is usually controlled by its ordinary meaning, we will adopt an alternative meaning "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a

2

particular embodiment as important to the invention .... Similarly, we will adopt a definition that is different from the ordinary meaning when 'the patentee acted as his own lexicographer and <u>clearly set forth a definition</u> of the disputed claim term in either the specification or prosecution history." *Edwards Lifesciences v. Cook*, 582 F.3d 1322, 1329 (Fed. Cir. 2009)(emphasis added)(internal citations omitted).

- "Generally, a claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a <u>'clear intention' to limit the claim's scope with 'words or expressions of manifest exclusion or restriction</u> (citing *Liebel-Flarsheim, supra*). *i4i Limited Partnership v. Microsoft*, (Fed. Cir. March 10, 2004).

7. An example of a case applying your quote from *Bell Atlantic* concerning consistent statements in the specification is *Nystrom v. TREX*, 424 F.3d 1136 (Fed. Cir. 2005). There, the term "board" was construed to be limited to a <u>wooden</u> board cut from a log, as contrasted with a board or plank made from plastic material. It was held to be so limited, not only because wood boards cut from logs was the only material disclosed in the patent, but many references in the specification described various aspects of and problems with prior art wood boards. For example, "The present invention represents a unique and significant advance in the art of exterior wood flooring" Also, the prosecution history distinguished prior art boards as not being wood. See 424 F.3d at 1142-45. The present '125 Patent contains no such pattern of emphasis on a specific type of "electrical connection."

8. In my opinion, the manner in which "electrically connected" is used in the '125 patent specification is merely as a term describing the disclosed elements of the circuitry, not as a definition, not as a restriction or exclusion of other alternatives, and certainly not with any apparent intent to limit the scope of the disclosure or the claims. The term was merely describing the relevant parts of the disclosed circuit, without any suggestion that only that form of connection (an electrical conductor without gaps) was essential or contemplated.

9. With regard to the use of the term in the title of the patent (see pp.10-13 of my R&R), upon further reflection I am inclined to give it a little more weight than I earlier stated. Referring to the patent excerpts I quoted on page 11, the stated purpose and advantage of the invention is that it permits two or more players to compete without being together at the site of a single physical game. That uniqueness was logically chosen as the focus for the title of the invention. There, the patentees described the two remotely located video games as being "electrically connected," notwithstanding that there is a gap or interruption in the conducting wires where the protective isolation transformers are located. See L1, L2 in Figure 3 and "line couplings and protective networks" 111 in Figure 2 (col. 4, lines 17-22). While the title alone is not controlling here, at least it supports a less restrictive interpretation, and does not contradict anything else in the intrinsic evidence. It shows that the patentees used "electrically connected" to refer not only to connections via an uninterrupted conducting wire but also to connections that included an internal gap within a

3

transformer. Unlike *Bell Atlantic*, the term here was not used consistently and solely to refer to gapless electrically conductive wires. Note that *Bell Atlantic* made note of the fact that the title of that patent was followed the consistent pattern in the patent's specification, wherein the terms "rate" and "mode" were described as distinct concepts, and therefore the court rejected the patentee's attempt to say that a variation in rate could be considered a change in mode. 262 F.3d at 1270.

10. Finally, there is the analogy of the gap in transformers to the gap in capacitors. Although they utilize different phenomena to permit the signals to bridge the gap (electromagnetic induction versus capacitance), both of the parties' dictionary definitions included a capacitor or capacitance as establishing an "electrical connection." See the two definitions on page 28 of my R&R. Recalling the early Microsoft definitions quoted in Paragraph 3 above, wherein an "electrical connection" is a connection that allows the flow of electricity between the two connected elements, the explanation of Microsoft's counsel at the October 23, 2009 hearing takes on further significance. As quoted at page 29 of my R&R, he explained that even though "the current doesn't flow directly across the gap [of a capacitor]," "one of ordinary skill in the art, they would understand a component A and a component B that are connected by a capacitor to be **electrically connected one to the other because current will flow between them**" (emphasis added). That explanation of the <u>result</u> of placing a gap-containing capacitor between two connected components is fully consistent with Microsoft's original definition of "electrically connected" (quoted in Paragraph 3 above). By analogy to the gap in a transformer, the same conclusion should apply. The '125 patentees also recognized the similar result or effect of transformers and capacitors, when they used the same term "couple" to describe the connection proved by both types of elements. See the paragraph bridging pp.29-30 of my R&R.

4